[No. 18260.   Department Two.   May 5, 1924.]

BAUMEISTER, VOLLMER & SCOTT BANK, *Appellant,* v. H. C. TALBOTT, *Respondent.*[1]

BILLS AND NOTES (141)—BONA FIDE PURCHASERS—GOOD FAITH—NOTICE OF INFIRMITIES—EVIDENCE—SUFFICIENCY. A bona fide holder of a note is not charged with notice of its infirmity by the fact of insertions in a different handwriting of the figure 8 as the rate of interest and the words "date" and "at maturity" referring to the time when interest commenced and was payable.

SAME (141). The fact that a note is a farmer's note made payable to the maker, does not put a subsequent holder on inquiry as to fraud in its origin, in view of Rem. Comp. Stat., § 3399, authorizing such a note.

EVIDENCE (26)—PRESUMPTIONS—FAILURE TO PRODUCE LETTER. The jury need not infer that a witness was withholding damaging testimony from the fact that he could not find and produce a letter where he was not even requested to furnish or try to procure a copy.

EVIDENCE (26)—PRESUMPTIONS—FAILURE TO ANSWER QUESTION. Error cannot be assigned on a witness' refusing to answer immaterial questions which he thought were intended merely to tease him, where they were unimportant and answers were not insisted upon.

BILLS AND NOTES (141)—BONA FIDE PURCHASERS—EVIDENCE—SUFFICIENCY. The purchaser of a note, fair on its face, is not charged with notice of its infirmities by the fact that instructions

[1]Reported in 225 Pac. 238.

were given the purchaser as to how to pay for it, where the instructions were not given either as agent or superior of the purchaser, but only as any seller of a negotiable instrument would do in taking his pay.

PEMBERTON, J.; dissents.

Appeal from a judgment of the superior court for Asotin county, Miller, J., entered January 9, 1923, upon the verdict of a jury rendered in favor of the defendant, in an action on a promissory note. Reversed.

*Homer L. Post* and *James E. Babb,* for appellant.

*M. F. Gose* and *Tannahill & Leeper,* for respondent.

MITCHELL, J.—The Baumeister, Vollmer & Scott Bank, claiming to be a purchaser for value before maturity and without notice of any infirmity in the instrument, brought this action against the maker to recover on a promissory note for $2,500 and interest. The case was tried to a jury, which found a verdict for the defendant. Plaintiff's motions for a directed verdict and for judgment notwithstanding the verdict being overruled, a judgment on the verdict was entered, from which the plaintiff has appealed.

We consider only the assignments relating to the denials of the motions. The note was for $2,500, dated February 14, 1921, due six months after date, payable to the order of H. C. Talbott, the maker and signer of the note, with interest at eight per cent per annum from date, payable at maturity, and was endorsed in blank by the maker. It was obtained by and delivered to one Scheps, in Asotin county, the home of the respondent, on account of the sale of stock in what was called the Washington-Idaho Lumber Corporation, of Lewiston, Idaho. It may and will be considered, for the purposes of this case, that the stock was worthless

and the note was obtained by actual fraud and without consideration. It appears that one Porter, who was associated with Scheps, became aware promptly of the fraudulent circumstances under which the note was procured. Neither of these two persons testified at the trial.

One Howard J. Kressly, connected with a company at Lewiston that was proposing to assist in financing the lumber company, learning that Porter wanted to sell the note in question, agreed to help him in disposing of it for a commission of five per cent, and by telephone called up Mr. Dyer of the First National Bank of Grangeville, Idaho, with whom he had done banking business, and offered to sell the note, describing it. There were several telephone conversations between them, and Kressly mailed the note to him upon being advised that Dyer had learned that the appellant would purchase it. Dyer, of the Grangeville bank, by telephone called Mr. Matthes, cashier of the appellant bank, and inquired if he knew H. C. Talbott, and if his note for $2,500 would be considered good. Matthes informed him that Talbott had not done any business at his bank for a number of years, that he was not in close touch with his financial affairs, but considered him good for that amount. At the same time, or about that time, Dyer inquired if he would like to purchase the Talbott note, to which Matthes replied he did not care to take it over, as he had to conserve the resources of the bank at that time.

About this time one E. E. Eastward, an employee engaged as auditor of several banks, including the Grangeville bank, who had seen the Talbott note and talked with Dyer about it at Grangeville, explained to Matthes over the telephone that the note could be had by his bank for certificates of deposit bearing four per cent interest per annum, due about a week after the

maturity of the Talbott note. Mr. Matthes, for his bank, consented to purchase the note on those terms, and Mr. Dyer, upon being so informed, forwarded the note with instructions to deliver certificates to or in the name of Mr. Kressly. Mr. Kressly called, and on requesting that four certificates to himself and one to another person, totaling $2,500, be issued, Mr. Matthes called Mr. Dyer, as to issuing one in the name of the other person, and was advised that whatever was agreeable to Mr. Kressly would be satisfactory, and the certificates were so issued and delivered by the bank on February 21, 1922, one week after the date of the Talbott note. The evidence shows that Kressly had transacted prior business with the Grangeville bank, including the sale to it of one or more notes, and that no trouble had arisen in those dealings. Mr. Matthes testified that, in purchasing the note, he supposed it belonged to Dyer or the Grangeville bank, and there is no testimony whatever contradicting that of Eastward, Dyer and Matthes that neither of them knew anything about the fraud in the inception of the note, neither of them knew it had been given for stock in the Washington-Idaho Company, and, indeed, neither of them knew at that time that there was such a corporation.

But it is said there were "danger signals" on the note and in the sale of it that were ignored by the appellant which directly, or by fair and reasonable inference, suggested the infirmity of the note, so as to take the question of the good faith of the bank in purchasing it to the jury.

One of these is that there was testimony to show that, after the note was delivered by the maker, the figure "8," expressing the rate of interest, was inserted, and that the word "date" and the words "at maturity," expressing when interest commenced and was payable, were written in different handwritings

from that of the signer of the note. The respondent himself testified that the only change made after he signed and endorsed the note was the adding of the figure "8" for the rate of interest. Matthes, Dyer, Eastward and Kressly all testified that at all times they saw the note it was in its present condition as to its contents. In 1 R. C. L. 1022, the rule is stated to be:

"Where a person executes an instrument containing blanks and entrusts it to a third person with power, express or implied, to fill the blanks in a certain manner, and such third person exceeds his authority in filling them, it is well settled that a bona fide holder will be protected, and the instrument is enforceable in his hands."

Again, it is said that the note is a farmer's note, made payable to the maker. Such a note is specifically authorized by § 3399, Rem. Comp. Stat. [P. C. § 4079], whatever the business or calling of the maker, and does not tend to suggest fraud in the origin of the note nor to put a subsequent holder upon inquiry.

Again, in the transaction leading to the purchase of the note, it appears that Dyer wrote a letter about it to Matthes, who did not and could not produce the letter. Considerable stress is laid on this as though the jury had the right to infer that Matthes was withholding damaging testimony. He testified, however, that, at the request of his counsel, he had searched more than once for, and was unable to find the letter. Mr. Dyer was a witness, and although the trial lasted several days, he was not even requested by respondent's counsel to furnish or try to procure his copy of the letter. Both of them testified as to its contents and were cross-examined thereon.

Again, some inference of importance is sought to be drawn, by way of withholding facts, because Matthes declined to answer two questions on cross-examination.

(1) He testified that the third party, in whose name one of the certificates of deposit was made out at the request of Kressly, was unknown to him. Counsel then asked him, "Is your bank in the habit of doing that kind of business with strangers—men whom you don't know, whose integrity you don't know, whose financial standing you don't know?" To which the witness said: "I refuse to answer the question." (2) In cross-examination, Mr. Matthes was examined fully with reference to the so-called changes in the written portion of the note and the supposedly different handwritings claimed to be shown or indicated thereon and then later in the cross-examination he testified that, in his experience as a banker, he had seen some eight or ten notes drawn payable to the maker, none of them the last ten years, that he "read the note before he paid for it, but the fact that it was payable to the maker did not excite my suspicion although an unusual note, that I did not take notice of the figure '8' nor the word 'date' nor the words 'at maturity' at the time I bought the note." And then he was asked: "Then you bought the note in a sort of careless way, didn't you?" To which he replied: "I refuse to answer the question." It is apparent that the questions related to immaterial matters and that the witness thought he was simply being teased and refused to answer. Manifestly the inquiries were considered unimportant else counsel would have insisted on answers, which he did not do.

Lastly, it is argued that, by a connecting line through Scheps, Porter, Kressly, Eastward and Dyer to Matthes, there was proof of guilty knowledge of agency, and especially because Dyer, who delivered the note to Matthes, instructed him how to pay for it. It has already been observed that Eastward, Dyer and Matthes knew nothing whatever about the consideration,

or lack of it, for the note. They were dealing with a negotiable instrument, fair on its face. Dyer was undisputed that he undertook to dispose of the note to accommodate Kressly, a patron of the Grangeville bank, and even this much was not known to Matthes, who at all times thought the note belonged to the Grangeville bank or to Dyer individually. The two banks were under control of separate and distinct boards, and while there may have been one or more persons who owned stock in both banks, there is no testimony that any one was a director of both banks, nor is there any evidence that Dyer had any interest in the appellant bank, that Matthes had any interest in the Grangeville bank, or that Eastward had any interest in either of them.

While it is true that in the testimony the word "instructed" was used in speaking of the directions or request of Dyer to Matthes in paying for the note by the certificates of deposit and the party or parties to whom they should be made payable, there is neither evidence, nor reasonable inference therefrom, that he directed or instructed as either an agent or superior of the appellant bank, but only as any seller of a negotiable instrument would do in taking his pay in the paper of a bank to which the sale was made.

The case is unlike that of *Allen v. Landre,* 120 Wash. 171, 206 Pac. 845, wherein we said:

"If appellant's testimony be true, then respondent's conduct with reference to this note would seem rather unusual and strange. If he were not the attorney or agent of the nitrate company, why did he permit himself to be represented as such? Why did he come to appellant's place of business with the agent, who had been guilty of fraud? Why did he not tell appellant that he intended buying the note? These matters and others shown were at least some proof that there was a confidential business relation between Etheridge and

the respondent, and that the latter knew of the infirmities of the note."

The statutes and rules applicable to this case are fully set out in the case of *Larsen v. Betcher,* 114 Wash. 247, 195 Pac. 27, and need not be repeated here.

Upon a consideration of the record, we think it must be held, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict, and that the motions of the appellant should have been granted.

Reversed, and remanded with directions to grant appellant's motion for a judgment notwithstanding the verdict.

MAIN, C. J., FULLERTON, and BRIDGES, JJ., concur.

PEMBERTON, J., dissents.